```
                    UNITED STATES DISTRICT COURT
                       DISTRICT OF NEW JERSEY

COMMERCE BANCORP, INC.,        :
                               :
        Plaintiff,             :   HONORABLE JOSEPH E. IRENAS
                               :   CIVIL ACTION NO. 06-cv-3371 (JEI)
    v.                         :
                               :        OPINION
BK INTERNATIONAL              :
INSURANCE BROKERS, LTD.,      :
                               :
        Defendant.             :
```

**APPEARANCES:**

BROWN & CONNERY, L.L.P.
By: Christine P. O'Hearn, Esq.
360 Haddon Avenue
P.O. Box 539
Westmont, New Jersey 08108
        Counsel for Plaintiff

SILVERMAN BERNHEIM & VOGEL
By: Jonathan A. Cass, Esq.
Two Penn Center
Suite 910
Philadelphia, Pennsylvania 19143
        Counsel for Defendant

**IRENAS**, Senior District Judge:

This dispute arises out of a failed corporate acquisition of Defendant, BK International Insurance Brokers, Ltd. ("BK International") by Plaintiff, Commerce Bancorp, Inc. ("Commerce").[1]  Presently before the Court is BK International's Motion to Dismiss the First Amended Complaint.

For the reasons set forth below, the Motion will be granted in part and denied in part.

---

[1] The Court has subject matter jurisdiction based on diversity of citizenship. *See* 28 U.S.C. § 1332. Plaintiff is a citizen of New Jersey and Defendant is a citizen of Connecticut. As discussed *infra,* the amount in controversy is alleged to exceed $75,000.

**I.**

Commerce and BK International executed a "Letter of Intent" on June 17, 2005, which laid out the material terms of a transaction whereby Commerce would acquire all of the issued and outstanding capital stock of BK International for $9.35 million worth of Commerce common stock.  (Compl.[2] Ex. A)  The agreement specifically contemplated that the parties would later enter into a "definitive acquisition agreement," or "Definitive Agreement." (Id.)  The Letter of Intent further stated:

> This letter constitutes an expression of mutual intention and is intended only as a guideline for the drafting of the Definitive Agreement, which will contain the terms set forth herein and additional terms and conditions yet to be discussed and agreed upon.  Each of [Commerce] and BK will incur legal, accounting and operating expenses in connection with this letter.  Accordingly, Paragraphs 5B (BK's obligations not to negotiate with others), and 8 (governing law) are legally binding upon each party. Other than such paragraphs, this letter is not and does not represent or constitute a legally binding agreement and until the Definitive Agreement is agreed upon, executed and delivered, except for Paragraphs 5B and 8, neither [Commerce] nor [BK] shall have any other rights or obligations arising from the provisions set forth in this letter.
>
> . . .
>
> It is the intent of the parties to consummate this transaction by August 31, 2005.  If the parties fail to consummate this transaction by that date, either [Commerce] or BK shall have the right to terminate this letter.

(Id.)

By August 31, 2005, the parties had not agreed upon a

---

[2] All citations to "Compl." refer to the First Amended Complaint.

Definitive Agreement.  The First Amended Complaint contains no allegations regarding the status of negotiations with respect to a Definitive Agreement prior to, or on August 31, 2005.  Commerce does allege, however, that even after the deadline had passed, BK International's principal owners "continued to affirmatively represent to [Commerce] that BK International intended to close the deal, even requesting that the deal close by either September 15, 2005, or October 1, 2005." (Compl. ¶ 10)  Based on these post-August 2005 representations, Commerce made various improvements to BK International's facilities in preparation for the acquisition.  Specifically, Commerce asserts that it constructed a new room, installed a three ton air conditioning unit, new wiring, computer systems, and telecommunications circuitry, and entered into contracts with outside vendors who would service the new systems.  (Id. ¶ 13)

Then, on September 12, 2005, BK International advised Commerce by telephone that BK International no longer intended to go through with the acquisition.  The next day, Commerce received a letter from BK International requesting that all due diligence materials be returned to BK International.

Less than two weeks later, Commerce received correspondence from Shelley Levine, one of BK International's five shareholders, "expressing hope that the deal may be closed in the future," and apologizing for the abrupt halt to the acquisition.  (Compl. ¶ 24)  David Kimball, another shareholder, also "expressed to

3

[Commerce] a desire to revisit the possibility of consummating the deal in the future," indicating that one particular shareholder, John Betz, was "responsible for the collapse of the deal." (Id. ¶¶ 25-27)  Commerce further asserts,

> In consideration for [Commerce's] agreement to consider resuming negotiations in the future and exploring the possibility of consummating a deal without John Betz, as well as for a release of potential liability stemming from the circumstances under which the deal was terminated, David Kimball, on behalf of BK International, offered to pay [Commerce] some amount of money.  After negotiations between David Kimball and [Commerce], an agreement was reached that BK International would pay $93,500.00[3] to [Commerce] in consideration for [Commerce's] promise to consider a future resumption of negotiations, [Commerce's] agreement to explore the possibility of proceeding with the acquisition without John Betz, [Commerce's] release of BK International from any potential liability which may have accrued from the circumstances under which they terminated the deal, and to compensate [Commerce] for the expenses and costs incurred in the construction of the new room and various improvements made to BK International's facilities.

(Id. ¶¶ 28-29)

Based on this alleged agreement (the "1% Agreement"), Commerce asserts that it completed an analysis of the feasibility of pursuing the acquisition without John Betz.  BK International never paid Commerce.  Commerce alleges that when it asked for payment, BK International requested that Commerce wait until May 1, 2006, to be paid.  Commerce agreed, but even after May 1, 2006, BK International never paid the $93,500.00, despite

---

[3]  The alleged offer is 1% of the Purchase Price stated in the Letter of Intent.  (Compl. Ex. A)

4

Commerce's repeated demands.

Commerce's First Amended Complaint asserts four claims: (1) breach of the 1% Agreement; (2) promissory estoppel based on BK International's post-August 2005 representations and Commerce's improvements to BK International's facilities; (3) negligent and intentional misrepresentation based on the post-August 2005 representations; and (4) unjust enrichment based on Commerce's improvements to BK International's facilities. BK International moves to dismiss each count of the First Amended Complaint.

## II.

Federal Rule of Civil Procedure 12(b)(6) provides that a court may dismiss a complaint "for failure to state a claim upon which relief can be granted." In considering a Rule 12(b)(6) motion, the Court accepts as true all of the factual allegations contained in the complaint and any reasonable inferences that can be drawn therefrom. *Nami v. Fauver*, 82 F.3d 63, 65 (3d Cir. 1996). Dismissal of claims under Rule 12(b)(6) should be granted only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). Although the Court must assume as true all facts alleged, "[i]t is not . . . proper to assume that the [plaintiff] can prove any facts that [are] not alleged." *Assoc. Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983).

5

III.

A.

In support of its motion to dismiss the breach of contract claim, BK International asserts two arguments: that the 1% Agreement is barred by the Statute of Frauds, and that the agreement lacked consideration.

New Jersey's Statute of Frauds provides,

> (1) Except in the cases described in subsection (2) a contract for the sale of personal property is not enforceable by way of action or defense beyond five thousand dollars in amount or value of remedy unless there is some writing which indicates that a contract for sale has been made between the parties at a defined or stated price, reasonably identifies the subject matter, and is signed by the party against whom enforcement is sought or by his authorized agent.
>
> (2) Subsection (1) does not apply to contracts for the sale of goods (12A:2-201) nor of securities (12A:8-113) nor to security agreements (12A:9-203).

N.J.S.A. § 12A:1-206.  BK International asserts that a sale of personal property includes the sale of a business, and therefore § 12A:1-206 applies to this transaction.  However, the allegations of the First Amended Complaint are clear that the 1% Agreement was not for the sale of BK International to Commerce, and not for the sale of any other personal property.[4]  As alleged, BK International was to pay Commerce $95,300 for: (a)

---

[4] "[T]he usual meaning of 'personal property' is all property other than real estate." *Hospitality Pac, Inc. v. First Occupational Ctr.*, No. 04-4562, 2006 U.S. Dist. LEXIS 1152 at *7 (D.N.J. Jan. 13, 2006)(citing, among other sources, Black's Law Dictionary).

Commerce's promise to consider a future resumption of negotiations; (b) Commerce's agreement to explore the possibility of proceeding with the acquisition without John Betz; (c) Commerce's release of BK International from any potential liability which may have accrued from the circumstances under which they terminated the deal; and (d) to compensate Commerce for the expenses and costs incurred in the construction of the new room and various improvements made to BK International's facilities.  Because the alleged agreement was not for the sale of personal property, § 12A:1-206 does not apply.[5]

BK International's argument regarding consideration also fails.  Commerce asserts that there was a bargained-for exchange of BK International's promise to pay $93,500 for Commerce's promise to release any claims arising out of the circumstances under which the deal was terminated, among other things.  BK International replies that "the only liability which could conceivably exist necessarily arose under the LOI [Letter of Intent] and necessarily would have been a claim thereunder.

---

[5] Alternatively, even if the statute did apply, it would not be a basis for dismissing the claim.  "Section 1-206 does not act in a way that would bar the contract completely.  Section 1-206, unlike the usual statute of frauds, merely makes the contract unenforceable beyond $5,000.  The conclusion is inescapable that unless the alleged contract is unenforceable for some other reason, the applicable statute of frauds would be no bar to enforcement of the contract to the extent of $5,000, regardless of the value of the property to be sold under the contract."  *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1145 (3d Cir. 1972); *see also California Natural, Inc. v. Nestle Holdings, Inc.*, 631 F. Supp. 465, 471 (D.N.J. 1986)(a contract subject to section 1-206 "will be unenforceable beyond $5000 unless this court determines that there is a writing that sufficiently indicates that a contract for sale has been made.").  BK International cites *Olympic Junior* and *California Natural* in its brief but puzzlingly argues that the breach of contract claim is completely barred by the statute.

However, the LOI does not provide for such a claim-- indeed, it specifically excludes such a claim." (Def's Reply Br. at 3) Therefore, BK International reasons, there was no liability to release, and thus, no consideration.

"The essential requirement of consideration is a bargained-for exchange of promises or performance that may consist of an act, a forbearance, or the creation, modification, or destruction of a legal relation. If the consideration requirement is met, there is no additional requirement of gain or benefit to the promisor, loss or detriment to the promisee, equivalence in the values exchanged, or mutuality of obligation." *Shebar v. Sanyo Bus. Sys. Corp.*, 111 N.J. 276, 289 (1988) (citations to Restatement (Second) of Contracts omitted). Here, Commerce alleges that there was a bargained-for exchange of promises.

BK International merely asserts that Commerce incurred no detriment by promising to release claims because there were no viable claims to release. However, when, as here, promises are exchanged, whether a detriment was incurred is irrelevant to the consideration analysis. The bargained-for exchange of BK International's promise to pay and Commerce's promise to release claims is valid consideration.

As explained hereafter, Commerce has sufficiently articulated a cause of action for promissory estoppel and unjust enrichment which gives real value to Commerce's promise to

release BK International.  BK International's Motion to Dismiss Count One, is therefore, denied.

B.

BK International asserts that Commerce has failed to plead sufficient facts to support either the promissory estoppel claim (Count 2) or the unjust enrichment claim (Count 4).

To state a claim for promissory estoppel, Commerce must plead facts establishing: "1) a clear and definite promise; 2) made with the expectation that the promisee will rely upon it; 3) reasonable reliance upon the promise; 4) which results in definite and substantial detriment."  *Lobiondo v. O'Callaghan*, 357 N.J. Super. 488, 499 (App. Div. 2003).[6]  Similarly, to state a claim for unjust enrichment, Commerce must plead facts establishing that BK International "received a benefit and that retention of that benefit without payment would be unjust." *Sasco 1997 Ni v. Zudkewich*, 166 N.J. 579, 593 (2001).  "The unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."

---

[6] *See also* Restatement (Second) of Contracts § 90 ("A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance is binding if injustice can be avoided only by enforcement of the promise. The remedy granted for breach may be limited as justice requires.").

9

*VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).[7]

Commerce asserts that the post-August 2005 assurances "that BK International intended to close on the deal" (Compl. ¶ 10) constituted a clear and definite promise upon which it reasonably relied by making the improvements to BK International's facilities. With respect to reliance specifically, Commerce asserts that it made the facility improvements "with the reasonable expectation that it would be compensated for them by being permitted to acquire the company even though the Letter of Intent had expired, because of defendant's repeated and continued assurance it intended to close the deal despite the expiration of the Letter of Intent." (Pl's Br. at 28)

With respect to the promissory estoppel claim, BK International argues that (1) the alleged assurances that it "intended to close on the deal" were too vague to be a clear and definite promise; and (2) Commerce's reliance was unreasonable as a matter of law because the assurances could not be seen as anything more than a continuation of the parties' agreement under the Letter of Intent, under which no party assumed any obligations with respect to the facility improvements.

The Court cannot hold that under no set of facts could

---

[7] *See also Assocs. Commercial Corp. v. Wallia*, 211 N.J. Super. 231, 244 (App. Div. 1986) ("A common thread running throughout successful invocation of the doctrine of unjust enrichment is that the plaintiff expected remuneration from the defendant, or if the true facts were known to plaintiff, he would have expected remuneration from defendant, at the time the benefit was conferred.")(internal quotations omitted).

10

Commerce establish that the assurances were clear and definite or that its reliance on those statements was reasonable. Both factors require highly fact and context specific inquiries. Deposition testimony or other evidence regarding negotiations and communications between these two sophisticated parties, before and after August 31, 2005, might support a finding that the alleged assurances were clear and definite when taken in the context of the parties' interactions and communications throughout the second half of 2005.[8]

Likewise, the Court cannot accept BK International's assertion that the parties' positions with respect to their obligations under the Letter of Intent, or otherwise, were not altered in any way after the August 31, 2005 deadline passed.[9] Here, too, evidence of communications and the course of negotiations may establish that Commerce's reliance on the post-August 2005 assurances was reasonable. Indeed, the very fact that Commerce was able to enter BK International's facilities and conduct major construction on BK International's building, if proven, is some evidence that BK International may have cooperated in, or at least did not object to, the improvements. Moreover, the Court has trouble accepting the implicit premise of

---

[8] The First Amended Complaint references various conversations, telephone calls, and correspondence between the parties. At this stage of the litigation, however, the Court has no other information regarding the specific substance of those communications.

[9] Nor does the Court necessarily accept Commerce's assertion that the Letter of Intent automatically expired and had no effect after August 31, 2005.

11

BK International's argument that Commerce, a sophisticated business, incurred costs "in excess of $44,738.32" (Compl. ¶ 16), with absolutely no assurances from BK International that Commerce would be compensated.

For these same reasons, the Court also cannot accept BK International's argument that no unjust enrichment claim can lie because Commerce could not have expected remuneration.  Just as the Court cannot rule that Commerce's reliance was unreasonable as a matter of law, it cannot rule that under no set of facts could Commerce have expected remuneration.

Accordingly, BK International's Motion to Dismiss Counts Two and Four will be denied.

C.

Lastly, Count Three of the First Amended Complaint asserts a claim for "Negligent and/or Intentional Misrepresentation." However, Commerce's opposition to the present motion completely ignores any claim for intentional misrepresentation, focusing solely on the claim for negligent misrepresentation.  To the extent Commerce does assert an intentional misrepresentation claim, it fails.  Commerce has alleged no facts that could reasonably support a conclusion that BK International made any statements knowing that they were false. *See Gennari v. Weichert Co. Realtors*, 148 N.J. 582, 610 (1997) ("The five elements of common-law fraud are: (1) a material misrepresentation of a

presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages.").[10]  Accordingly, the intentional misrepresentation claim will be dismissed.

The negligent misrepresentation claim must also be dismissed because it is not a viable claim under New Jersey law, given the facts of this case.  In discussing negligent misrepresentation cases, the New Jersey Supreme Court has observed,

> Importantly, the cases do not involve a breach of contract claim between parties in privity; rather, they involve tort claims by innocent third parties who suffered purely economic losses at the hands of negligent defendants *with whom no direct relationship existed.* Courts have justified their finding of liability in these negligence cases based on notions of a *special relationship* between the negligent tortfeasors and the foreseeable plaintiff who relied on the quality of defendants' work or services, to their detriment.  The special relationship, in reality, is an expression of the courts' satisfaction that a *duty of care* existed because the plaintiffs were particularly foreseeable and the injury was proximately caused by the defendant's negligence.

*People Express Airlines v. Consol. Rail Corp.*, 100 N.J. 246, 256-57 (1985) (emphasis added).  As *People Express* discusses, common negligent misrepresentation cases include suits by third-party, non-clients against independent auditors, attorneys, architects, and notaries public.  *Id.* at 284.

Similarly, with respect to negligent misrepresentations, the

---

[10]  *See also* Restatement (Second) of Torts §§ 525, 526 (tort of fraudulent misrepresentation includes a scienter element).

Restatement (Second) of Torts § 552 provides:

> Information Negligently Supplied *for the Guidance of Others*
>
> (1)  One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information *for the guidance of others in their business transactions*, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) . . . the liability stated in Subsection (1) is limited to loss suffered
>
> (a)  by the person or one of a limited group of persons *for whose benefit and guidance he intends to supply the information* or knows that the recipient intends to supply it; and
>
> (b)  through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.

(emphasis added).

This case simply is not a negligent misrepresentation case. This dispute involves two parties to a contract, who negotiated at arms-length to achieve the acquisition of a business. Commerce and BK International had a direct relationship, and no special duty of care existed between them.[11]  Commerce does not allege that BK International made the alleged assurances for

---

[11] *See Alexander v. Cigna Corp.*, 991 F. Supp. 427, 440 n.21 (D.N.J. 1998)("The parties effectively concede that their respective independent research failed to locate a single New Jersey case in which a cause of action for negligent misrepresentation was successfully asserted between commercial entities who were parties to arms-length contractual arrangements."); *see also Worbetz v. Ward N. Am.*, 54 F.App'x 526, 533 (3d Cir. 2002)(rejecting a broad application of New Jersey's doctrine of negligent misrepresentation).

Commerce's "benefit and guidance."[12] To the contrary, Commerce alleges BK International made the assurances to further its own interests, to the detriment of Commerce. Thus, the Court concludes that the negligent misrepresentation claim must fail as a matter of law.

BK International's Motion to Dismiss Count Three of the First Amended Complaint will be granted.

**IV.**

For the reasons stated above, BK International's Motion to Dismiss will be granted in part and denied in part. The Motion will be granted as to Count Three and denied in all other respects. The Court will issue an appropriate order.

Date: June 4, 2007

                                         _s/ Joseph E. Irenas_
                                     JOSEPH E. IRENAS, S.U.S.D.J.

---

[12] *See* Restatement (Second) of Torts § 552, comment h. ("The rule stated in this Section subjects the negligent supplier of misinformation to liability only to those persons for whose benefit and guidance it is supplied. In this particular his liability is somewhat more narrowly restricted than that of the maker of a fraudulent representation (see § 531), which extends to any person whom the maker of the representation has reason to expect to act in reliance upon it.").